UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------ x
JAKWAN RIVERS and                    :
DEBRA CRENSHAW,                       :
                                     :
            Plaintiffs,              :
                                     :     **MEMORANDUM & ORDER**
            -against-                :     11-CV-5065 (KAM) (MDG)
                                     :
NEW YORK CITY HOUSING AUTHORITY;     :
JOHN RHEA, individual;               :
GLORIA FINKELMAN, individual;        :
CAROLYN JASPER, individual;          :
CARL WALTON, individual;             :
MELETHIL ALEXANDER, individual;      :
LOCAL 237 INTERNATIONAL BROTHERHOOD   :
OF TEAMSTERS;                        :
GREGORY FLOYD; and                   :
REMILDA FERGUSON,                    :
                                     :
            Defendants.              :
------------------------------------ x
**Matsumoto, United States District Judge:**

        Plaintiffs    Jakwan    Rivers    and    Debra    Crenshaw

("plaintiffs") initiated this action against the New York City

Housing Authority ("NYCHA"), NYCHA employees John Rhea ("Rhea"),

Gloria Finkelman ("Finkelman"), Carolyn Jasper ("Jasper"), Carl

Walton    ("Walton"),    and    Melethil    Alexander    ("Alexander"),

(collectively, the "NYCHA defendants"), as well as the Local 237

International Brotherhood of Teamsters (the "Union" or "Local

237"), Union President Gregory Floyd ("Floyd"), and Union official

Remilda    Ferguson    ("Ferguson")    (collectively,    the    "Union

defendants") alleging that defendants conspired to and did in fact

retaliate against them for exercising their First Amendment free

speech and association rights. Defendants have separately moved for summary judgment on all claims. For the reasons provided herein, the Union defendants' motion for summary judgment is GRANTED in its entirety, and the NYCHA defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## BACKGROUND

### I.  Factual Background

The following facts are set forth from the admissible evidence of record and are viewed in the light most favorable to plaintiffs as the non-moving parties. The court will provide a general background of the events giving rise to this action. The fact-specific nature of the allegations, however, makes it more prudent to discuss certain factual details that are supported by admissible evidence throughout the court's analysis as particular details become relevant.

#### A.  Rivers

*Rivers' Initial Work at NYCHA*

Rivers began working for NYCHA as a maintenance worker in April 1998. (NYCHA 56.1 at ¶ 37; Pl. 56.1 at ¶ 1.) He became a member of the Union as soon as he began his employment at NYCHA. (NYCHA 56.1 at ¶ 38) Rivers' principal job duties involved emergency construction work near Long Island City. (*Id.* at ¶ 37.) Rivers worked at NYCHA until January 2006. (Pl. 56.1 at ¶ 1.) Throughout that period, he had a perfect disciplinary record

without any negative evaluations or feedback. (*Id.* at ¶ 22.) In January 2006, Rivers took a leave of absence from NYCHA to work at the Union as a "business agent." (*Id.* at ¶ 1.) In that capacity, he handled Union member grievances, visited members' work locations to investigate grievances, and defended members in local disciplinary hearings. (NYCHA 56.1 at ¶ 24.)

*Rivers' Work at the Union*

In March 2007, Floyd became the Union president. (NYCHA 56.1 at ¶ 19.) Beginning in January 2008 Floyd and his subordinate Ferguson, the director of the Union's housing division, told all Union employees that the Union backed then-Mayor Michael Bloomberg for the 2009 New York City mayoral election. (Pl. 56.1 at ¶ 4.) Around June 2008, Rivers learned that Floyd had begun to implement a policy of permitting NYCHA management to terminate Union members without opposition to solidify his relationship with NYCHA management. (*Id.* at ¶ 5.) Rivers alleges that Floyd told him to let the terminations "take [their] course." (*Id.*) It is undisputed however, that the number of terminations of Local 237-represented NYCHA employees did not materially differ during 2007 and 2008 from the number of terminations of Local 237-represented NYCHA employees in other years. (Union 56.1 at ¶ 124.)

In part because of their dissatisfaction with Floyd's leadership and in part because of their support for William Thompson (Bloomberg's Democratic opponent in the 2009 mayoral

race), Rivers and six colleagues began to organize an alternative Union slate, Members for Change, and announced in August 2008 that members of the group would run a slate of candidates against Floyd and his supporters in the upcoming October 2009 Union elections. (Pl. 56.1 at ¶¶ 7, 9.) Members for Change distributed campaign literature, some of which including Rivers' photograph indicating that he was running for vice president of the Union. (*Id.* at ¶ 8; Union 56.1 at ¶ 28.) Toward the end of 2008 and the beginning of 2009, Rivers publicly announced Members for Change's opposition to Floyd and its endorsement of Thompson in Union meetings before hundreds of members. (Pl. 56.1 at ¶¶ 10-11.)

Rivers alleges that Floyd's adherents at the Union took notice of Rivers' political activities. In November 2008, Rivers alleges that one of his supervisors screamed and cursed at him while he was discussing a Union member's grievances on the telephone. (*Id.* at ¶ 57.) A few weeks later, Union Deputy Director James Giocastro ("Giocastro") allegedly told Rivers that he should support Bloomberg for mayor because the Union could have him "placed anywhere" in the city, suggesting that the Union could assign him to an inconvenient or undesirable work location. (*Id.* at ¶ 13.) On January 27, 2009, Floyd terminated Rivers' position as a business agent. (*Id.* at ¶ 12.) Rivers alleges, thought the Union disputes, that Floyd expressly told Rivers that it was due

to his support for Thompson for mayor. (*Id.* at ¶ 12; Union Resp. to Pl. 56.1 at ¶ 12.)

*Rivers' Return to NYCHA*

Rivers immediately returned to NYCHA in his former position as a maintenance worker. (Pl. 56.1 at ¶ 15.) On January 27, 2009, upon learning that Rivers was being reassigned to NYCHA, defendant Finkelman, NYCHA's deputy general manager for operations, placed Rivers in the Bronx, at a NYCHA facility called the St. Mary's Houses without speaking to anyone at Local 237. (NYCHA 56.1 at ¶ 46-49, 56.) It is undisputed that an employee has no right to return to his prior location after a term with the Union. (Union 56.1 at ¶ 36.) Rivers claims that his placement created a travel hardship for him because he lived in Suffolk County on Long Island.[1] (Pl. 56.1 at ¶ 20.) It is undisputed that Finkelman placed Rivers at St. Mary's Houses based on NYCHA availability and need. (NYCHA 56.1 at ¶ 54.) Rivers asserts that on his first day at St. Mary's Houses, the assistant superintendent said to him that Finkelman had told St. Mary's staff that Rivers had opposed the wrong people and that his supervisors should therefore make his life miserable.[2] (Pl. 56.1 at ¶ 21.) That same day, Rivers was issued what he claims was a baseless counseling

---

[1] Rivers contends that NYCHA employees who were Floyd/Bloomberg supporters returning from a stint at the Union were permitted to return to their prior assignments, though defendants strongly dispute this. (*Compare* Pl. 56.1 at ¶ 14, *with* Union Resp. to Pl. 56.1 at ¶ 14.)

[2] This statement, however, is inadmissible hearsay.

memorandum[3] for failing to find himself a work assignment. (*Id.* at ¶ 22.)

At St. Mary's Houses, instead of the construction work he had previously done, Rivers was assigned to a position where his duties generally involved repair work inside NYCHA housing units. (*Id.* at ¶ 15.) His work entailed electrical repair, plumbing, carpentry, appliance repair, and door and window repair. (*Id.*) Rivers claims, though defendants dispute, that he received insufficient training to perform these tasks. (*Id.*)

Rivers' frustration at St. Mary's Houses led him to informally request transfers from Finkelman. In February 2011, soon after Rivers began requesting a transfer, NYCHA Deputy General Manager for Administration Natalie Rivers (no relation to Rivers) emailed Finkelman to tell her that Union President Floyd was "driving [her] crazy" by insisting that Rivers "is supposed to be at St. Mary's." (*Id.* at ¶ 86.) Finkelman responded, telling Natalie Rivers that Rivers should remain in the Bronx. (*Id.*)

In March 2009, Rivers (through counsel) filed an administrative petition before the New York City Board of Collective Bargaining. (Union 56.1 at ¶ 51.) In the petition, Rivers complained, as relevant here, that the Union and NYCHA had

---

[3] "A Counseling Memorandum is a form of formal disciplinary action used by the NYCHA." *Dingle v. City of New York*, No. 10-CV-4, 2012 WL 1339490, at *1 (S.D.N.Y. Apr. 17, 2012).

colluded to place him in the Bronx in retaliation for his opposition to Floyd. (NYCHA 56.1 at ¶¶ 63-64; Union 56.1 at ¶ 51; ECF No. 92, Declaration of Jeffery Niederhoffer ("Niederhoffer Decl."), Ex. 28.) In August 2009, NYCHA and Rivers signed a written stipulation of settlement in which Rivers released his claims in exchange for a placement at a NYCHA facility closer to his home. (Niederhoffer Decl., Ex. 30; Union 56.1 at ¶ 52.)

*Rivers' Tenure at the South Jamaica Houses*

In September 2009, pursuant to the stipulation of settlement, Rivers was transferred to the South Jamaica Houses development in Queens. (Pl. 56.1 at ¶ 26; NYCHA 56.1 at ¶ 65.) Rivers continued to protest, however, that he was not properly trained for his job responsibilities. Though it is undisputed that Rivers received many trainings, Rivers states that they were superficial and did not adequately prepare him for his daily responsibilities at NYCHA. (Pl. 56.1 at ¶ 17; NYCHA 56.1 at ¶¶ 37, 58-59, 69-71, 75-78, 91.)

Shortly after his transfer to the South Jamaica Houses, Rivers alleges that Union Deputy Director Giocastro visited the development and told Rivers' supervisor Margo Madden ("Madden") as well as the South Jamaica Houses superintendent that they "could do anything they want to Rivers, such as giving him any assignments and writing him up for any reason, and the Union would not represent Rivers or stop their abuse." (Pl. 56.1 at ¶ 26.) Rivers

alleges that Giocastro told Rivers that Giocastro would permit the mistreatment because Rivers was running against Floyd and supporting Thompson. (*Id.* at ¶ 27.) Rivers alleges that Madden and Rivers' other supervisors subsequently began to assign him physically strenuous tasks while refusing to provide him the tools he needed to complete the tasks, and St. Mary's Houses Superintendent Alan Guadagno purportedly mocked Rivers' work continually. (*Id.* at ¶¶ 28-29.)

In the months preceding the October 2009 Union elections, Rivers alleges that a subordinate of Union President Floyd admitted to a Union business agent that the Union was working to end Rivers' employment at NYCHA (Pl. 56.1 at ¶ 84.)

In November 2009, Rivers complained about his treatment at NYCHA by email to NYCHA Chairman Rhea as well as to his NYCHA supervisors Madden and Jasper. Jasper advised Maddden not to respond but instead to take "the high road as we discussed today treat him fair, and issue work accordingly." (Niederhoffer Decl., Ex. 38.) Jasper subsequently updated Chairman Rhea to let Rhea know that NYCHA would provide training to Rivers. (*Id.*, Ex. 40.) Rhea responded and stated that "disciplinary consequences" should follow if Rivers failed "to meet expectations." (*Id.*) In December 2009, Rivers claims he was injured due to his lack of training. (Pl. 56.1 at ¶ 38.)

In February 2010, Rivers complained to NYCHA officials Finkelman and Jasper as well as to NYCHA Chairman Rhea about a threat NYCHA manager Madden allegedly made about him to a tenant. (Pl. 56.1 at ¶¶ 33-37; NYCHA 56.1 at ¶ 82.) Although it is undisputed that NYCHA investigated the threat, Rivers claims that the investigation was insufficient. (*Id.*) A few months later, in July 2010, Rivers claims that he was again injured and that NYCHA and the Union colluded to contest workers' compensation benefits he sought after the injury. (Pl. 56.1 at ¶¶ 39-45.)

In September 2010, Rivers again emailed Chairman Rhea directly to complain about his lack of training and the injuries he had suffered, though Rhea did not respond to the emails. (NYCHA 56.1 at ¶ 98; Pl. 56.1 at ¶ 35.) After Rivers' return from workers' compensation leave, in February 2011, he received a purportedly baseless counseling memorandum from an assistant superintendent at the South Jamaica Houses; although the counseling memorandum was revoked, Rivers was never reimbursed the pay he lost. (Pl. 56.1 at ¶¶ 48-49.) Rivers also alleges that NYCHA repeatedly denied him overtime and leave under the Family and Medical Leave Act. (*Id.* at ¶¶ 51-55.)

In 2010, Rivers (through counsel) filed a second administrative petition with the New York City Board of Collective Bargaining. (ECF No. 85, Declaration of Stephen B. Moldof ("Moldof Decl."), Ex. 18; Union 56.1 at ¶ 53.) The petition alleged that

NYCHA and the Union had worked together to punish NYCHA employees (including both Rivers and Crenshaw) for supporting Members for Change, and included many of the specific allegations Rivers brings in this action. (Union 56.1 at ¶¶ 53-55.) The petition was withdrawn in June 2011. (*Id.* at ¶ 56; Moldof Decl., Ex. 19.)

In December 2012, at his deposition, Rivers claimed to be totally disabled and unable to work. (Union 56.1 at ¶ 4.)

B.    Crenshaw

Crenshaw began working at NYCHA in March 1995 as a housing assistant. (NYCHA 56.1 at ¶ 111.) She was promoted to a managerial position in March 2006. (*Id.* at ¶ 112.) Crenshaw began attending Members for Change meetings in August 2008, shortly after she met Rivers. (Pl. 56.1 at ¶¶ 58-59.) She became more vocal on behalf of Members for Change in January 2009, when she began canvassing at NYCHA facilities before work. (*Id.* at ¶ 60.) Her canvassing continued in March 2009. (NYCHA 56.1 at ¶ 31.) She also alleges that she had discussions about Members for Change in April 2009 and June 2010. (Pl. 56.1 at ¶¶ 75-76.)

In February 2009, Crenshaw's supervisors, Alexander and Walton, met with Crenshaw. (*Id.* at ¶¶ 62, 64.) During the meeting, they increased Crenshaw's workload and reduced her authority by telling her that her then-subordinates would begin reporting to Alexander instead. (*Id.*) She alleges that her new job responsibilities — which were time-consuming and burdensome — were

not borne by other assistant housing managers. (*Id.*) It is undisputed, however, that assistant managers at other locations were given many of the same tasks as Crenshaw. (NYCHA 56.1 at ¶ 116.)

In March 2009, Alexander issued Crenshaw a counseling memorandum for missing work during a snowstorm that Crenshaw claims crippled public transportation and prevented her from commuting to work. (Pl. 56.1 at ¶ 67.) After Crenshaw complained to Walton around March 2009 about the new job responsibilities and said she would discuss her concerns with the Union, Walton stated that he and Union official Ferguson had known each other for 18 years, which indicated to Crenshaw that the Union would not defend her. (*Id.* at ¶ 73.) Soon after Crenshaw's conversation with Walton, Union representative Giocastro attended a meeting with Walton and Crenshaw to discuss Crenshaw's concerns. (*Id.* at ¶ 74.) Crenshaw alleges that after Giocastro began to defend her against an allegedly unwarranted counseling memorandum, Walton raised his hand and said: "Don't you know who this is, she is the one who is going up against you and Floyd." (*Id.*) Crenshaw claims that Giocastro immediately ceased defending her. (*Id.*) Crenshaw also alleges that she complained via email to NYCHA managers including Chairman Rhea throughout 2009 and 2010 about her alleged mistreatment, though there does not appear to be any record of the purported emails. (*Id.* at ¶ 82.)

11

A string of counseling memoranda followed in April and May 2009 that Crenshaw complains were entirely baseless. (*Id.* at ¶¶ 68-69.) For example, in April 2009, Walton issued Crenshaw a counseling memorandum for "insubordination" after she yelled and cursed at him; Crenshaw claims the allegations were false. (*Id.* at ¶ 68; NYCHA 56.1 at ¶ 121.) Crenshaw claims that she always performed her work in a "timely and accurate manner," despite feeling overwhelmed by her new responsibilities. (Pl. 56.1 at ¶ 69.) Overall, between March 2009 and May 2010 Crenshaw received three instructional memoranda and nine written counseling memoranda. (NYCHA Resp. to Pl. 56.1 at ¶ 69.)

NYCHA served Crenshaw with notice of a hearing in October 2009 that would address three serious disciplinary charges against Crenshaw. First, Crenshaw was charged with creating a hostile work environment and insubordination to Alexander on June 11, 2009. The second charged that Crenshaw failed to follow instructions between May 20 and 28, 2009. The third charge Crenshaw faced was for failing to follow NYCHA rental procedures on September 18, 2009. (*Id.* at ¶ 79; Niederhoffer Decl., Ex. 65-66; NYCHA 56.1 at ¶¶ 136-44.) Crenshaw alleges that Union representative Giocastro, who was assigned to represent her at the October 2009 hearing, failed to prepare or seriously contest the allegations against her. (Pl. 56.1 at ¶ 79.) Alexander testified at the hearing and Crenshaw was ultimately found guilty of two of the three charges by a neutral

hearing officer. (Niederhoffer Decl., Ex. 66; NYCHA 56.1 at ¶¶ 136, 140.)

In April 2010, Crenshaw alleges that Alexander sexually assaulted her when he "pressed up behind [her] and rubbed his erect penis on [her] buttocks." (ECF No. 102, Declaration of Alexander Coleman, Ex. C, Declaration of Debra Crenshaw ("Crenshaw Decl.") at ¶ 25.) Crenshaw filed a report with NYCHA's Department of Equal Opportunity, but she claims that NYCHA took no action against Alexander. (Pl. 56.1 at ¶ 71.) Alexander testified at his deposition, however, that an internal investigation occurred and that the charges against him were dismissed. (ECF No. 95, Declaration of Donna M. Murphy, Ex. 1, Alexander Deposition at 59-61.) One week after the assault, Alexander issued her a counseling memorandum for being AWOL during the time she reported her complaint about Alexander's assault. (Pl. 56.1 at ¶ 72.)

Crenshaw claims that the increased workload and stress brought on by the disciplinary actions and harassment caused her to develop serious back and neck problems. (*Id.* at ¶¶ 80-81.) By August 2010, she claims she was incapacitated. (*Id.*) She sought workers' compensation, which was granted in part over NYCHA's opposition. (NYCHA 56.1 at ¶¶ 147-50.) Pursuant to NYCHA policy, after she had been absent for one year due to disability, she was terminated in August 2011. (*Id.* at ¶ 151-52.) She returned to work

at NYCHA in July 2012 as an assistant manager in the Bronx, but retired in early 2014. (*Id.* at ¶ 153; Union 56.1 at ¶ 6.)

## II.  **Procedural Background**

Plaintiffs filed their complaint in this action alleging claims under 42 U.S.C. § 1983 ("§ 1983") on October 18, 2011. (ECF No. 1, Complaint.) They amended their complaint on February 28, 2012. (ECF No. 14, Amended Complaint ("Am. Compl.").) Plaintiffs' motion to supplement the pleadings and re-open discovery was denied on November 17, 2014. (ECF No. 72.) Plaintiffs bring two claims against the NYCHA defendants under § 1983. The first alleges that the NYCHA defendants retaliated against them for exercising their First Amendment right to freedom of speech. The second alleges that the NYCHA defendants retaliated against them for exercising their First Amendment right to freedom of association. They also bring two related claims against the Union defendants. The first alleges that the Union defendants conspired with the NYCHA defendants to retaliate against them for exercising their right to freedom of speech. The second alleges that the Union defendants conspired with the NYCHA defendants to retaliate against them for exercising their right to freedom of association.[4]

---

[4] None of the parties meaningfully distinguish between the plaintiffs' speech and association claims in this case. In any event, retaliation claims based on freedom of speech are subject to the same analysis as retaliation claims based on freedom of association. *See Lynch v. Ackley*, 811 F.3d 569, 583 (2d Cir. 2016) ("This claim based on [plaintiff's] First Amendment association rights is subject to the same analysis as set forth above for [plaintiff's] First Amendment free-speech right based

Defendants have separately moved for summary judgment and filed memoranda of law in support of their motions. (ECF No. 89, NYCHA Memorandum in Support of Motion for Summary Judgment ("NYCHA Mem."); ECF No. 80, Union Memorandum in Support of Motion for Summary Judgment ("Union Mem.").) Plaintiffs filed an opposition addressing both motions. (ECF No. 101, Plaintiffs' Memorandum in Opposition to Defendants' Motions for Summary Judgment ("Pl. Opp'n.").) Defendants filed replies. (ECF No. 94, NYCHA Reply in Support of Motion for Summary Judgment ("NYCHA Reply"); ECF No. 97, Union Reply in Support of Motion for Summary Judgment ("Union Reply").)

The parties have also filed statements of material facts (as well as responses) in accordance with Local Rule 56.1. (ECF No. 89, Ex. 2, NYCHA Statement of Material Facts ("NYCHA 56.1"); ECF No. 81, Union Statement of Material Facts ("Union 56.1"); ECF No. 103, Plaintiffs' Statement of Material Facts ("Pl. 56.1"); ECF No. 104, Plaintiffs' Response to NYCHA 56.1 ("Pl. Resp. to NYCHA 56.1"); ECF No. 105, Plaintiffs' Response to Union 56.1 ("Pl. Resp. to Union 56.1"); ECF No. 108, NYCHA Response to Plaintiffs' 56.1

---

on the same incident."). Because the speech rights at issue in this action are closely bound up with the association rights, the court's analysis does not generally differentiate between the two types of claims.

("NYCHA Resp. to Pl. 56.1"); ECF No. 98, Union Response to Plaintiffs' 56.1 ("Union Resp. to Pl. 56.1").)

## SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate "where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 224 (2d Cir. 2006) (internal quotation marks and citation omitted). "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015) (internal quotation marks and citation omitted).

## DISCUSSION

The court turns to the issues raised by defendants' motions for summary judgment. First, the court will address the preclusion concerns presented by the defendants regarding the two earlier-filed administrative petitions. Second, the court will address liability for the entity defendants: NYCHA and the Union. Third, the court will provide the appropriate legal standards for

the First Amendment retaliation claims and the conspiracy claims. Fourth, the court will evaluate Rivers' claims. Finally, the court will address Crenshaw's claims.

## I.   <u>Preclusion</u>

At the outset, the court must examine defendants' arguments that certain claims in this action are precluded because of actions taken by Rivers and Crenshaw in two administrative proceedings.

### A.   <u>The 2009 Improper Practice Petition</u>

On March 5, 2009, Rivers, represented by counsel, filed an "Improper Practice Petition"[5] against Local 237 and NYCHA. (NYCHA 56.1 at ¶ 63.) Among other grievances, Rivers complained of his assignment to the Bronx upon his return to work at NYCHA. (*Id.*) He had previously been assigned to Long Island City, which was closer to his home, and sought a reassignment there. (*Id.*) NYCHA filed an answer to the petition on April 24, 2009. (*Id.* at ¶ 64.) On August 24, 2009, the parties agreed to settle the petition and entered into a stipulation providing for Rivers' transfer to the South Jamaica Houses in Queens as a maintenance worker. (*Id.* at ¶ 65.)

---

[5] An Improper Practice Petition is a complaint alleging violations of the New York City Collective Bargaining Law by, for example, a public employer. *See* N.Y.C. Admin. Code Title 12, ch. 3. It is filed with the Board of Collective Bargaining. *See id.* § 12-306.

The settlement, signed by Rivers, his attorney, and a representative of NYCHA, "resolve[d] any and all claims on behalf of Rivers that may have arisen from or related to [sic] the matters addressed in [the 2009 Improper Practice Petition]." (Niederhoffer Decl., Ex. 30, at 2.) Rivers agreed to withdraw his claims with prejudice. (*Id.*) Rivers has conceded that claims "arising from or relating to the matters alleged" in the 2009 petition are barred in this action. (*See* Pl. Opp'n at 19 ("Plaintiffs do not seek damages for Rivers' January 27, 2009 assignment to the Bronx. . . .") The court accepts that concession for purposes of deciding these motions.

B.  The 2010 Improper Practice Petition

A separate issue is raised by a 2010 Improper Practice Petition filed, and later withdrawn, by Rivers and Crenshaw. The Union defendants argue that the withdrawal of the 2010 petition bars certain claims asserted by both plaintiffs in this litigation.[6]

The 2010 Improper Practice Petition alleged that NYCHA and the Union sought to penalize NYCHA employees who backed the Members for Change slate in the 2009 Local 237 election. (*See* Moldof Decl., Ex. 18; *see also* Union 56.1 at ¶ 53.) The petition alleged that NYCHA and the Union "collectively engaged in a[n]

_____

[6] The NYCHA defendants do not join the Union's argument regarding the 2010 petition.

18

unlawful attempt to violate the rights of the membership by disallowing fair and impartial disciplinary practices to ensue, and selective disciplinary practices to those in opposition of the current leadership." (Moldof Decl., Ex. 18.) The petition specifically mentions a variety of retaliatory actions that overlap with the allegations in the Amended Complaint in this action. For example, the petition mentions Rivers' lack of training for certain work duties, the denial of repeated transfer requests resulting in two on-the-job injuries, the opposition to Rivers' workers' compensation claim, the denial of certain requests for FMLA leave, and the physical threats allegedly made against Rivers to a NYCHA tenant. (*See* Moldof Decl., Ex. 18; *see* also Union 56.1 at ¶ 54.) The petition also alleges that Crenshaw was disciplined for minor infractions and subjected to constant harassment by her manager. (*See* Moldof Decl., Ex. 18; *see* also Union 56.1 at ¶ 55.) Ultimately, the petitioners, through counsel, withdrew the petition. (*See* Moldof Decl., Ex. 19; *see also* Union 56.1 at ¶ 56.) The withdrawal — which contains the signatures of Rivers, Crenshaw, and various other NYCHA employees — provides that the signatories "would like to rescind our complaint submitted to the Office of Collective Bargaining." (See Moldof Decl., Ex. 19; see also Union 56.1 at ¶ 56.) An e-mail sent by Rivers' attorney contains the withdrawal document as an attachment: the document is titled "COMPLETE WITHDRAWAL LETTER FOR OCB." (Moldof Decl., Ex. 19.)

The Union defendants argue that plaintiffs are barred from pursuing any claims mentioned in the 2010 petition that were "with[drawn] with prejudice." (Union Mem. at 28.) Plaintiffs respond that the Union's "assertion is objectively untrue and is made in bad faith" because the withdrawal does not suggest or establish that "any individual intended to give up or waive any rights with prejudice." (Pl. Opp'n at 20.)

To determine whether plaintiffs waived their right to bring this § 1983 action, "this Court does not rely on New York law, since 'the question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law.'" *Legal Aid Soc'y v. City of New York*, 114 F. Supp. 2d 204, 226 (S.D.N.Y. 2000) (quoting *Brookhart v. Janis*, 384 U.S. 1, 4 (1966)). The waiver of a fundamental right "cannot be presumed or lightly inferred, and courts must indulge every reasonable presumption against waiver." *Intermor v. Inc. Vill. of Malverne*, No. 03-CV-5164, 2007 WL 2288065, at *8 (E.D.N.Y. Aug. 8, 2007) (internal quotation marks and citation omitted); *see also Fuentes v. Shevin*, 407 U.S. 67, 94 n. 31 (1972) ("[I]n the civil no less than the criminal area, courts indulge every reasonable presumption against waiver." (internal quotation marks and citation omitted)).

With these background principles in mind, the court concludes that the withdrawal of the 2010 petition is

insufficiently unequivocal for a determination that plaintiffs waived their federal constitutional rights. The language in the waiver provides that the plaintiffs wished to "rescind" the complaint. (Moldof Decl., Ex. 19.) Nowhere does the withdrawal provide that it was "with prejudice," as the Union defendants inaccurately argue.[7] (Union Mem. at 28.) Instead, the withdrawal in this case bears a strong resemblance to a voluntary dismissal without prejudice under Fed. R. Civ. P. 41(a). In the Fed. R. Civ. P. 41(a) voluntary dismissal context, where it is unclear whether a withdrawal was with or without prejudice, Fed R. Civ. P. 41(a)(1)(B) provides that the dismissal is without prejudice and a "dismissal without prejudice does not preclude another action on the same claims." *Chappelle v. Beacon Commc'ns Corp.*, 84 F.3d 652, 654 (2d Cir. 1996); *Thai v. United States*, 391 F.3d 491, 497 (2d Cir. 2004) (per curiam) (applying Fed. R. Civ. P. 41(a) voluntary dismissal principles in federal habeas context, though the federal rules of civil procedure need not be employed in federal habeas cases); *see also* 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2367 (3d ed.) ("[A]s numerous federal courts have made clear, a voluntary dismissal without prejudice

---

[7] The court declines to ascribe significance to the withdrawal document's file name: "COMPLETE WITHDRAWAL." (Moldof Decl., Ex. 19.) Waiver of a federal constitutional right cannot rest on the file name of a PDF document. In any case, even a withdrawal without prejudice could fairly be characterized in some circumstances as a "complete withdrawal."

under Rule 41(a) leaves the situation as if the action never had been filed.").

The court cannot find a waiver based on the thin evidence presented here, particularly given the strong presumption against waiver. *See Fuentes*, 407 U.S. at 94 n.31. For purposes of the defendants' motions, no legal significance attached to the withdrawal of the 2010 Improper Practice Petition.

## II. Liability Under § 1983 for NYCHA and the Union

Before proceeding with an analysis regarding individual liability, the court will address the issue of liability for NYCHA as well as liability for the Union.

A municipal entity like NYCHA can only be held liable if its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). "Whether or not a single individual possesses 'final policymaking authority' is an issue of state law." *Chin v. New York City Hous. Auth.*, 575 F. Supp. 2d 554, 562 (S.D.N.Y. 2008) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

Policymaking authority for NYCHA is placed in a seven-member body that includes the chairman. *See* N.Y. Pub. Hous. Law § 402(3) ("The authority shall consist of seven members appointed by the mayor, one of whom shall be designated by the mayor as

chairman removable at his or her pleasure."); *see also Ramos v. City of New York*, No. 96-CV-3787, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997) (dismissing NYCHA because NYCHA board — rather than the NYCHA chairman, who the plaintiff alleged directly "discriminated against him and ratified a subordinate's discriminatory conduct" — had final policymaking authority). Because Rhea did not have final policymaking authority, because there is no indication that the NYCHA board delegated such authority to him, and because there is no evidence that any other board member had notice of the alleged retaliation at issue in this action, NYCHA must be dismissed.

For a similar reason, the Union — the entity itself, as opposed to the two Union employee defendants (Floyd and Ferguson) — must also be dismissed. The Second Circuit has extended *Monell*'s rationale to private entities[8] when they are sued under § 1983. *See Green v. City of New York*, 465 F.3d 65, 82 (2d Cir. 2006) "Private employers are not liable under § 1983 for the constitutional torts of their employees . . . unless the plaintiff proves that action pursuant to official . . . policy of some nature caused a constitutional tort. Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses."

---

[8] Unions are private entities. *See Wilkie v. Robbins*, 551 U.S. 537, 566 (2007); *Turner v. Air Transp. Lodge 1894 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 590 F.2d 409, 413 n.1 (2d Cir. 1978) (Mulligan, J., concurring).

*Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408-09 (2d Cir. 1990) (internal quotation marks, citations, and alterations omitted).

Here, plaintiffs argue that they were specifically targeted for retaliation based on their political beliefs, but do not anywhere propose that the Union had a policy or practice of engaging in such conduct beyond their individual situations. The Union is therefore dismissed from this action. *See, e.g.*, *Gitter v. Target Corp.*, No. 14-CV-4460, 2015 WL 5710454, at *3 n.4 (S.D.N.Y. Sept. 29, 2015) ("Although the parties do not raise this issue, because Target is a corporation, to find Target liable for a violation of § 1983 Plaintiff would also have to offer evidence that Plaintiff's handcuffing was pursuant to Target's policy or custom.").

## III. Legal Standard for First Amendment Retaliation Claims

To survive summary judgment on a First Amendment retaliation claim, a plaintiff must establish a prima facie case by "bring[ing] forth evidence showing that [1] he has engaged in protected First Amendment activity, [2] he suffered an adverse employment action, and [3] there was a causal connection between the protected activity and the adverse employment action." *Smith*, 776 F.3d at 118 (internal quotation marks and citation omitted).

A.    Protected First Amendment Activity Standard

Courts employ a two-step inquiry to evaluate whether a public employee's speech or association is protected under the First Amendment. The first step requires evaluating whether the employee spoke as a citizen on a matter of public concern.[9] *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). The Supreme Court has defined "a matter of public concern" as one that "relat[es] to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). Second, if the employee spoke on a matter of public concern, the court must determine whether the relevant government entity "had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." *Lane v. Franks*, 134 S. Ct. 2369, 2380 (2014) (internal quotation marks and citation omitted); *see also Pickering v. Bd.*

---

[9] Although there had previously been some uncertainty about whether the "public concern" requirement applied to associational claims, *see Clue v. Johnson*, 179 F.3d 57, 60 n.2 (2d Cir. 1999) ("[I]t is anything but clear whether the public concern requirement applies to associational claims made by government employees."), courts have since held that even associational claims must involve "associational activity" touching upon a matter of public concern. *See Rutherford v. Katonah-Lewisboro Sch. Dist.*, 670 F. Supp. 2d 230, 246 (S.D.N.Y. 2009) ("[I]n order to state a viable First Amendment free association claim, Plaintiff must allege that the associational activity at issue touches upon a matter of public concern."); *see also Cobb v. Pozzi*, 363 F.3d 89, 105 (2d Cir. 2004) (concluding that the "public concern requirement applies to freedom of association claims"). It is not clear from the briefing whether NYCHA's challenge on the "public concern" issue is addressed both to plaintiffs' speech and association claims. The court will assume for purposes of this decision that NYCHA's arguments about the failure to meet the "public concern" requirement are directed to all of plaintiffs' claims.

*of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968).

B.    <u>Applicable "Adverse Employment Action" Standard</u>

With respect to the second element of a First Amendment retaliation claim, the adverse employment action requirement, "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik*, 464 F.3d at 225. An adverse employment action includes a "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). The Second Circuit has cautioned, however, that "lesser actions may also be considered adverse employment actions,"[10] *id.* (citation omitted), and emphasized that whether an action qualifies as adverse is a "heavily fact-specific, contextual determination." *See Hoyt v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006). A "campaign of harassment which though trivial in detail may [be] substantial in gross, and therefore . . .

---

[10] In a recent case in the education context, the Second Circuit explained that "[a]dverse employment actions may include negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." *Zelnik*, 464 F.3d at 226 (internal quotation marks and citations omitted).

actionable." *Zelnik*, 464 F.3d at 227; *see also Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass.").

The "standard for an 'adverse action' in the context of First Amendment retaliation is substantially similar to the same inquiry in the Title VII retaliation context." *Manon v. Pons*, No. 12-CV-7360, 2015 WL 5507759, at *7 n.8 (S.D.N.Y. Sept. 18, 2015) (citation omitted). The standard for what constitutes a retaliatory adverse action both under Title VII in the First Amendment context is broader, however, than in the Title VII discrimination context. *See Burlington*, 548 U.S. at 64 (recognizing that Title VII's anti-retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment"); *Taylor v. New York City Dep't of Educ.*, No. 11-CV-3582, 2012 WL 5989874, at *9 (E.D.N.Y. Nov. 30, 2012) ("The standard for an adverse employment action in retaliation claims is considerably broader than the standard for discrimination claims under Title VII." (internal quotation marks and citation omitted)).

C.   <u>Applicable Causation Legal Standard</u>

The parties dispute the appropriate legal standard to be employed in the evaluation of causation for First Amendment

retaliation claims. Plaintiffs argue that the appropriate test evaluates whether the relevant protected speech was a substantial motivating factor in the adverse employment action. (Pl. Opp'n at 30-31.) Defendants contend that *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), a recent Supreme Court decision holding that Title VII retaliation claims are subject to a "but for" causation standard, applies in the First Amendment retaliation context as well. (NYCHA Mem. at 5-6; Union Mem. at 13-14 & n.10.)

*Nassar* held that the "text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." 133 S. Ct. at 2534. The Second Circuit has, on at least two occasions since *Nassar*, addressed causation standards in the First Amendment retaliation context. First, in *Puglisi v. Town of Hempstead, Dep't of Sanitation, Sanitary Dist. No. 2*, 545 F. App'x 23, 25 (2d Cir. 2013), a plaintiff appealed a summary judgment granted to various defendants on, *inter alia*, a Title VII retaliation claim and a First Amendment retaliation claim. The court explicitly recognized that *Nassar*'s "but for" causation standard doomed the plaintiff's Title VII retaliation claim. *Id.* The court, however, separately addressed plaintiff's First Amendment claim. *Id.* at 26-27. Although the court concluded that

the plaintiff could not carry his causation burden, it explained his burden as follows, citing a case predating *Nassar*: "'Even if there is evidence that the adverse employment action was *motivated in part by protected speech*, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech.'" *Id.* at 26 (alteration omitted) (emphasis added) (quoting *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011)). The court's use of the above-quoted "motivated in part" language, coupled with its citation to a case predating *Nassar* to provide the applicable causation standard, strongly suggests that the substantial motivating factor test for evaluating causation for First Amendment retaliation claims survived *Nassar*.

An even more recent post-*Nassar* Second Circuit case reached a similar outcome. In *Georges v. Peters*, 581 F. App'x 80, 81 (2d Cir. 2014), the Second Circuit affirmed a district court's dismissal of a Title VII claim because the plaintiff could not meet *Nassar*'s "but-for" causation standard. In that same decision, the court affirmed the dismissal of a First Amendment retaliation claim "for substantially the same reasons stated by the district court," *id.* at 80, where the district court — post-*Nassar* — had applied the substantial motivating factor test to evaluate causation. *See Georges v. Peters et al.*, No. 10-CV-7436 (S.D.N.Y. Oct. 8, 2013), ECF No. 57, at 11. *Peters*, like *Puglisi*, suggests

that the Second Circuit is disinclined to extend *Nassar*'s "but-for" standard to First Amendment retaliation claims.[11]

Further, courts both in this circuit and others have declined to apply *Nassar* to First Amendment retaliation claims. *See Jagmohan v. Long Island R. Co.*, No. 12-CV-3146, 2014 WL 4417745, at *14, *16 (E.D.N.Y. Sept. 8, 2014) (post-*Nassar* decision applying *Nassar* to Title VII retaliation claim but applying substantial motivating factor test to First Amendment retaliation claim). The only circuit court to squarely address the applicability of *Nassar* in the First Amendment retaliation context held that *Nassar* does not apply to First Amendment retaliation claims. *See Mooney v. Lafayette Cnty. Sch. Dist.*, 538 F. App'x 447, 453 n.4 (5th Cir. 2013) ("The holding in *Nassar*, however, does not apply to the First Amendment causation standard, which requires only that protected speech be a 'substantial' or 'motivating' factor in the adverse employment action suffered by the plaintiff."); *see also Stoner v. Ark. Dep't. of Corr.*, 983 F. Supp. 2d 1074, 1099 (E.D. Ark. 2013) (applying substantial motivating factor test to First Amendment retaliation claim and

---

[11] The court emphasizes *Peters* and *Puglisi* because these two cases both involve First Amendment retaliation claims as well as citations to *Nassar* to address related Title VII retaliation claims. In another post-*Nassar* First Amendment retaliation case not involving any Title VII claims, the Second Circuit explicitly stated that to "demonstrate a causal connection a plaintiff must show that the protected speech was a *substantial motivating factor* in the adverse employment action." *Smith*, 776 F.3d at 118 (emphasis added).

explicitly distinguishing *Nassar*); *Powell v. Doane*, No. 12-CV-440, 2013 WL 4511935, at *4 n.3 (M.D. Ala. Aug. 23, 2013) (same).[12]

The court acknowledges that at least two district courts in this circuit have held that *Nassar* applies to First Amendment retaliation claims. *See Zehner v. Bd. of Educ. of the Jordan-Elbridge Cent. Sch. Dist.*, No. 11-CV-1202, 2015 WL 5708797, at *6 n.1 (N.D.N.Y. Sept. 29, 2015); *Mazur v. New York City Dep't of Educ.*, 53 F. Supp. 3d 618, 638 (S.D.N.Y. 2014) *aff'd*, 621 F. App'x 88 (2d Cir. 2015) (affirming dismissal of First Amendment retaliation claim on unrelated ground because the speech at issue did not address matter of public concern). Neither the *Zehner* court nor the *Mazur* court, however, discussed *Nassar* in any detail, and the *Mazur* court extended the *Nassar* standard to a First Amendment retaliation claim despite the defendant's argument that the substantial motivating factor test applied. *See* No. 12-CV-687, ECF No. 58, at 28-29.

Even setting aside the precedent, most of which provides little or no justification for extending (or refusing to extend) *Nassar*, there are strong reasons not to apply *Nassar* to § 1983 actions, particularly § 1983 actions involving First Amendment

---

[12] Additionally, the Committee on Model Civil Jury Instructions for the Third Circuit — which is composed exclusively of district judges in the Third Circuit — has determined that *Nassar* "did not disturb the standard used for First Amendment retaliation claims." Model Civ. Jury Instr. 3rd Cir. 7.4 (2015) ("[T]he causation standard for Title VII retaliation claims is 'but for' causation, while the causation standard for First Amendment retaliation claims is 'motivating factor . . . .'").

retaliation claims. First, neither the majority nor the dissent in *Nassar* even mentions § 1983 or the First Amendment. Second, as the *Nassar* majority itself took pains to explain, the decision was grounded in the "text, structure, and history of Title VII." 133 S. Ct. at 2534. A decision so strongly rooted in Title VII should not necessarily apply to § 1983, which has its own distinctive text, structure, and history. *See Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 225-27 (2d Cir. 2004) (emphasizing significant distinctions between Title VII and § 1983 in reversing grant of summary judgment for § 1983 claims while affirming grant of summary judgment for Title VII claims); *see also Keller v. Prince George's Cnty.*, 827 F.2d 952, 955 (4th Cir. 1987) (discussing the broader remedies available to plaintiffs under § 1983 than Title VII, and further emphasizing the longer statutes of limitations and lack of exhaustion requirement under § 1983).[13]

Having considered the Second Circuit's decisions in *Puglisi* and *Peters*; the other cases both in and outside this circuit outlined above that explicitly refused to extend *Nassar* to

---

[13] "The primary doctrinal differences between Title VII claims and employment discrimination claims pursuant to Sections 1981 and 1983 regard (1) the statute of limitations, (2) the requirement that Section 1981 or 1983 plaintiffs must show employment discrimination pursuant to an official policy or custom, (3) that individuals may be held liable under Sections 1981 and 1983, but not under Title VII, and (4) a Title VII claim may be established through proof of negligence, whereas Section 1981 and 1983 claims must be supported by evidence of intentional discrimination." *Jackson v. City of New York*, 29 F. Supp. 3d 161, 170 n.10 (E.D.N.Y. 2014) (citing *Patterson*, 375 F.3d at 225-27).

the First Amendment retaliation context; and the significant distinctions between § 1983 and Title VII, the court concludes that plaintiff's First Amendment retaliation claims are governed by the substantial motivating factor causal test rather than the but-for causal test.[14]

D.    Conspiracy Standard

Plaintiffs additionally seek to hold the Union defendants liable under § 1983. Because the Union defendants are private actors not generally subject to § 1983 actions, plaintiffs argue that they are liable since they conspired with the NYCHA defendants to retaliate against them for exercising their First Amendment rights. To establish a conspiracy, plaintiffs must show: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002).

IV.    **Rivers**[15]

---

[14] The court concludes, however, that none of Rivers' claim can survive under either standard while Crenshaw's claims that survive would survive under both standards. Accordingly, the court will discuss both causation standards throughout its analysis of plaintiffs' claims.

[15] Defendants correctly point out that plaintiffs' Rule 56.1 statement of facts contains many particularly egregious allegations about statements made and actions taken by NYCHA and Union officials that were never referenced in the amended complaint or revealed in plaintiffs' depositions. (*See* Union Reply at 2-3 n.4, 7-8.) Almost all of the new allegations are sourced from Rivers' affidavit filed in support of plaintiffs' opposition to the defendants' motions for summary judgment.

As set out above, to establish a viable First Amendment retaliation claim, Rivers must show that: (1) he engaged in constitutionally protected speech as a private citizen speaking on a matter of public concern; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected speech and the adverse employment action. *See Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). The court will address the three elements as they pertain to Rivers' various claims.

A.   Constitutionally Protected Activity

Rivers must first show that his protected activity constitutes speech (or association) as a citizen related to a matter of public concern. *See Garcetti*, 547 U.S. at 418. If he

---

(*See* Pl. 56.1 at ¶¶ 13, 22, 24, 27, 29, 56, 84-85.) Rivers' affidavit contains many of the most unflattering allegations at issue in this litigation. It is troubling that these allegations did not surface in his deposition or in the complaint. "A certification or affidavit opposing a summary judgment motion is not a vehicle for plaintiff to reshape the theory and underlying facts of her discrimination claims as originally pled in her Complaint." *Petrisch v. HSBC Bank USA, Inc.*, No. 07-CV-3303, 2013 WL 1316712, at *11 (E.D.N.Y. Mar. 28, 2013); *see also Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("Factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."). The court concludes that it is not obligated to consider or discuss the plaintiffs' late-breaking allegations. For two reasons, however, the court will discuss the new facts as part of its analysis. First, Rivers' claims cannot survive summary judgment even if a factfinder were to consider the new facts. Second, *some* of the new facts in Rivers' affidavit do not *expressly* contradict his prior testimony. *See Jin Dong Wang v. LW Rest., Inc.*, 81 F. Supp. 3d 241, 259-60 (E.D.N.Y. 2015) (considering allegations raised for the first time in affidavit submitted in opposition to motions for summary judgment where "majority of the alleged contradictory statements identified by Defendants were made prior to the motion for summary judgment, were not directly contradictory, and, at best, appear to be ambiguous, vague, or capable of multiple explanations").

34

succeeds, the court must next evaluate whether NYCHA "had an adequate justification for treating [him] differently from any other member of the public based on the government's needs as an employer." *Lane*, 134 S. Ct. at 2380. Here, the central disputed issue is whether Rivers spoke or associated on a matter of public concern.[16]

Rivers proposes that he engaged in two types of First Amendment protected activity: (1) his support for William Thompson for New York City mayor and (2) his work on behalf of Members for Change in opposition to the Floyd slate. Rivers contends that his support for Thompson, as well as Floyd's acquiescence to NYCHA management, led him to form Members for Change, along with six of his colleagues, in July 2008. (Pl. 56.1 at ¶ 7; NYCHA 56.1 at ¶ 26.) In October 2008, he announced, at a meeting of at least 100

---

[16] NYCHA does not argue that Rivers and Crenshaw's activities were undertaken in their capacities as employees rather than in their capacities as citizens. If the activities were undertaken in their capacities as employees, the activities would not receive First Amendment protection. *See Lane*, 134 S. Ct. at 2378 ("Whereas speech as a citizen may trigger protection, the Court held [in *Garcetti*] that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." (internal quotation marks and citation omitted)). Neither does NYCHA argue that it had a strong efficiency or disciplinary interest in treating Rivers or Crenshaw differently from other members of the public. *See Connick*, 461 U.S. at 150-51 (recognizing "the government's legitimate purpose in promoting efficiency and integrity in the discharge of official duties, and [maintaining] proper discipline in the public service" (internal quotation marks, citation, and some alterations omitted)).

Union members, that Members for Change endorsed Thompson for mayor. (Pl. 56.1 at ¶ 10.) On January 26, 2009, Rivers again announced Members for Change's endorsement of Thompson, and its opposition to the Floyd slate, this time at a meeting of approximately 250 Union members. (*Id.* at ¶ 11.) Rivers actively campaigned on behalf of Members for Change and Thompson until the Local 237 board member elections in October 2009 and the mayoral elections in November 2009.[17] (*Id.* at ¶¶ 7-12.)

The NYCHA defendants argue that retaliation claims arising out of plaintiffs' opposition to the Floyd slate must be dismissed because that opposition constituted an intra-union dispute that did not touch on a matter of public concern.[18] (NYCHA Mem. at 14-16; NYCHA Reply at 5-6.) Plaintiffs argue that their opposition to Floyd was a result of his "collu[sion] with management to completely circumvent members' collectively bargained for rights" and therefore that their actions involved matters of public concern. (Pl. Opp'n at 23.)

---

[17] Although it appears that Rivers' opposition to Floyd continued after November 2009 (*see* ECF No. 48), Rivers does not allege any protected activity beyond November 2009 that is relevant to this action, and he may not do so. (*See* ECF No. 72 (this court's order precluding plaintiffs from supplementing the pleadings and re-opening discovery in this action).)

[18] The Union defendants do not join the NYCHA defendants' argument regarding the public concern requirement. The Union defendants appear to concede that Rivers has established that his actions (both his speech and his association) touched on matters of public concern.

Although "retaliation against public employees solely for their union activities violates the First Amendment," *Clue v. Johnson*, 179 F.3d 57, 60 (2d Cir. 1999), "[t]here may well be intraunion disputes that do not raise enough of a public concern to trigger First Amendment protection." *Id.* at 61. In *Clue*, which both parties recognize is controlling here, members of a vocal faction of a transit workers' union had challenged union leadership on the ground that "union leaders were 'in bed' with management and supported management policies that redounded to the disadvantage of workers." *Id.* They alleged that their employer, the New York City Transit Authority, retaliated against them for their activities. *Id.* at 58-59. The Transit Authority argued that the employees' activities were purely an internal dispute within the union, and therefore not entitled to First Amendment protection. *Id.* at 60. The Second Circuit disagreed, and held that the employees' activities — even if they could be characterized as "'factional' rather than as tantamount to 'union activity,'" — did not merely involve internal union affairs. *Id.* at 61. Instead, the employees had "substantial[ly] critici[zed] management," and such criticism "raise[d] matters of public concern." *Id.*

NYCHA argues that Members for Change "criticized Union leadership and policy, not management's labor policies." (NYCHA Reply at 5.) The evidence suggests, however, that much of Members for Change's platform involved both explicit and implicit

criticism of NYCHA management. For example, Members for Change literature contained allegations that Local 237 officials "Permitted Management to terminate union employees at an Alarming rate" and "Allowed Management to violate Union Contractual Agreements with no Opposition." (Niederhoffer Decl., Ex. 17.) A flyer including Rivers' photograph and name urged union members to "vote for leadership that pledges their commitment to the Local 237 membership and not to management." (*Id.*, Ex. 16.) Another flyer stated that "Local 237 members have been fighting a losing battle against management." (*Id.*, Ex. 18.) Rivers' challenges to Local 237 leadership closely resemble the transit employees' challenges to union leadership in *Clue*, where the faction's argument was that "union leaders were 'in bed' with management and supported management policies that redounded to the disadvantage of workers." 179 F.3d at 61. Indeed, in many ways, the two factional challenges appear practically identical.

NYCHA correctly points out that some Members for Change campaign literature is directed at perceived Union shortcomings that do not involve relations with management (NYCHA Mem. at 14-15), but strong criticism of management is sufficient under *Clue* to raise matters of public concern. *See* 179 F.3d at 61. The court concludes that strong criticism of management can be found in the above-quoted literature alone. *Clue* does not require or even remotely suggest that the speech and associational activities of

a union faction be *exclusively* targeted at union-management relations to touch on matters of public concern.[19] Consequently, viewing the record in the light most favorable to the non-moving plaintiffs, the court finds for purposes of defendants' motions that Rivers' opposition to the Floyd slate, and its relationship with NYCHA, was protected activity.

In addition, though neither defendant argues otherwise, Rivers' public support for William Thompson for mayor similarly constitutes protected activity. *See, e.g.*, *Burns v. Cook*, 458 F. Supp. 2d 29, 40 (N.D.N.Y. 2006) ("[P]laintiff's public support of the candidate running for a position on the Board of Education is protected speech under First Amendment retaliation law."); *see also Seale v. Madison Cnty.*, 929 F. Supp. 2d 51, 70 (N.D.N.Y. 2013) ("The support of a candidate for public office can reasonably be considered a matter of public concern."); *Kelly v. Huntington Union Free Sch. Dist.*, 675 F. Supp. 2d 283, 294 (E.D.N.Y. 2009) ("To the extent the mass mailing in support of a Board candidate was an improper political activity, it can reasonably be considered a matter of public concern.").

B.     Adverse Employment Actions

---

[19] At the very least, plaintiffs have shown that there is a genuine issue of material fact concerning whether their activities related to a matter of public concern. *See Novak v. Bd. of Educ. of Fayetteville-Manlius Cent. Sch. Dist.*, No. 05-CV-199, 2007 WL 804679, at *5 (N.D.N.Y. Mar. 14, 2007) (denying summary judgment where genuine issue of material fact existed about whether "Plaintiff engaged in protected union-organizing speech or merely spoke about internal workplace grievances").

Defendants next argue that Rivers has failed to establish any adverse employment actions to support his First Amendment retaliation claims. As discussed earlier, a plaintiff must show that he suffered an adverse employment action to establish a First Amendment retaliation claim. *See Ruotolo*, 514 F.3d at 188. To establish a genuine issue of material fact with regard to whether a particular action constitutes an adverse employment action in the First Amendment retaliation context, a plaintiff must show that the retaliatory action "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Zelnik*, 464 F.3d at 225 (internal quotation marks and citation omitted).

Rivers proposes a lengthy list of actions that he claims constitute adverse employment actions. (Pl. Opp'n at 27-28.) At the outset, the court concludes that Rivers cannot assert as adverse any employment actions predating the August 2009 stipulation dismissing with prejudice the 2009 Improper Practice Petition. Since no claim can arise from actions preceding the stipulation (*see* Niederhoffer Decl., Exs. 28-30; *see also supra* Discussion Part I.A), Rivers is precluded from arguing that any action taken by defendants preceding the stipulation constitutes an adverse employment action. Additionally, for reasons explained in further detail below in the court's discussion about causation (*see infra* Discussion Part IV.C), the court will not consider

purportedly retaliatory acts occurring more than a year after Rivers' protected speech concluded. Accordingly, based on the temporal parameters suggested by the Second Circuit between the protected activity and the adverse employment action, the court will only discuss purportedly adverse employment actions that occurred between the 2009 stipulation and November 2010, one year after the conclusion of the November 2009 mayoral election (the latest time in which Rivers engaged in protected speech).

The court will thus consider the asserted adverse actions that fall within the aforementioned temporal bounds. Rivers alleges that the following constitute adverse employment actions: (1) Floyd's statement made to a Union subordinate, in front of Rivers in late 2009, to the effect of: "you see what happens when you go against the grain" (Pl. 56.1 at ¶ 56); (2) South Jamaica Houses Superintendent Guadagno's continuous mocking of Rivers (*id.* at ¶ 29); (3) NYCHA's denial of overtime requests made by Rivers (*id.* at ¶¶ 51-54); (4) NYCHA's denial of requests made for leave under the Family and Medical Leave Act to care for Rivers' dying mother (*id.* at ¶ 55); (5) Rivers' rebuffed requests to NYCHA and Union officials for additional training or for a transfer to a position for which he was adequately trained (*id.* at ¶¶ 15, 17-18, 30-32); (6) NYCHA's opposition to Rivers' request for workers' compensation after Rivers was ostensibly injured on the job in July 2010 (*id.* at ¶¶ 39-45); and (7) Madden's actions

assigning Rivers "the most physically strenuous responsibilities" (*id.* at ¶ 28).[20]

The court will evaluate Rivers' claims individually, mindful, however, that a "campaign of harassment which though trivial in detail may [be] substantial in gross, and therefore . . . actionable." *Zelnik*, 464 F.3d at 227; *see also Phillips*, 278 F.3d at 109 ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass.").

*(1) Floyd Statement*

Rivers' first allegation stems from Floyd's purported statement to a Union subordinate in the presence of Rivers in late 2009. (Pl. 56.1 at ¶ 56.) Floyd allegedly told the subordinate: "You see what happens when you go against the grain." (*Id.*)

---

[20] Rivers also alleges that the following constitute adverse employment actions: (1) Union official Giocastro's statement to NYCHA manager Madden and the South Jamaica Houses superintendent that they could "do anything they want to Rivers" without expecting Union opposition because of Rivers' support for Thompson and opposition to Floyd (Pl. 56.1 at ¶¶ 26-27); (2) Union official Donald Arnold's statement to Union business agent Felicia Cannon that the Union was working with NYCHA to terminate Rivers' employment (*id.* at ¶ 84); and (3) a purported threat about Rivers made by a NYCHA official to a tenant in February 2010 (*id.* at ¶¶ 33-37). Because these three allegations are based entirely on hearsay, the court does not consider them. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out *facts that would be admissible in evidence* . . . ."); *Marshall v. Allison*, 908 F. Supp. 2d 186, 196 (D.D.C. 2012) (holding that plaintiff's testimony about a defamatory statement made during a meeting at which plaintiff was not present constituted inadmissible hearsay and therefore could not be used to defeat a motion summary judgment).

Threats of retaliation standing alone do not generally constitute adverse employment actions. *See Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 269 (E.D.N.Y. 2012) ("As an initial matter, threats of termination cannot, by themselves, constitute an adverse employment action."); *Gross v. Home Depot U.S.A., Inc.*, 386 F. Supp. 2d 296, 298 n.2 (S.D.N.Y. 2005) ("With respect to her retaliation claim, Plaintiff has accused Buchanan of, at most, threatening to retaliate against her, but a threat of retaliation, by itself, does not constitute an adverse employment action."). Consequently, Floyd's statement – which is, in any case, susceptible to many different meanings – cannot constitute an adverse employment action.

*(2) Guadagno Criticism*

Rivers next alleges that South Jamaica Houses Superintendent Alan Guadagno "regularly and harshly ridiculed and criticized Rivers' performance on the assignments for which he had been denied adequate training." (Pl. 56.1 at ¶ 29.) Rivers provides little more detail, except to allege that "Guadagno regularly laughed at Rivers' work and mockingly asked him how he expected to be Union President when he cannot even be a competent maintenance worker." (*Id.*)

"Courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions." *Murray*, 853 F. Supp. 2d at

266; *Johnson v. Conn. Dep't of Corr.*, 392 F. Supp. 2d 326, 340 (D. Conn. 2005) ("The 'routine ridicule' that [plaintiff] allegedly suffered also does not, without more, rise to the level of an adverse employment action for retaliation claims."); *cf. Brennan v. City of White Plains*, 67 F. Supp. 2d 362, 374 (S.D.N.Y. 1999) ("While verbal abuse might at times be sufficiently severe and chronic to constitute an adverse employment action, such behavior, without more, hardly rises to the level of actionable retaliation."). Conduct "which could be found to be offensive, discourteous, demeaning, and/or belittling" does not constitute an adverse employment action for purposes of a retaliation claim. *Sangan v. Yale Univ.*, No. 06-CV-587, 2008 WL 350626, at *4 (D. Conn. Feb. 7, 2008).

In this case, Rivers' allegations surrounding Guadagno's demeaning comments do not rise to the level of an adverse employment action. Instead, even as alleged, they appear to constitute "routine ridicule" that is not actionable through a First Amendment retaliation claim.

*(3) Overtime*

Rivers also claims that he was repeatedly denied overtime opportunities that were provided to similarly situated employees. (Pl. 56.1 at ¶¶ 51-54.) Although Rivers proffers no evidence of a particular occasion on which he requested and was denied overtime, he argues that at least six other maintenance

workers "worked significantly more overtime than what Rivers was granted." (*Id.* at ¶ 52.)

A deprivation of the opportunity to earn overtime can be an adverse employment action. *See Mazyck v. Metro. Transp. Auth.*, 893 F. Supp. 2d 574, 589 (S.D.N.Y. 2012) (finding that plaintiff who was denied requested overtime had shown adverse employment action); *Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 235 (W.D.N.Y. 2011) ("The denial of overtime may constitute an adverse employment action in some circumstances . . . ."); *Little v. Nat'l Broad. Co., Inc.*, 210 F. Supp. 2d 330, 379 (S.D.N.Y. 2002) (evidence that plaintiff "incurred an actual loss in income because of lost overtime and that he was forced to work undesirable shifts with an erratic schedule . . . , if true, could prove that [plaintiff] was subject to an adverse employment action"). Failure to substantiate an allegation of retaliatory overtime denial with anything more than a conclusory allegation in an affidavit is, however, highly problematic. *See Hayle v. Nassau Health Care Corp.*, No. 08-CV-2396, 2013 WL 6231164, at *6 (E.D.N.Y. Dec. 2, 2013) (in title VII context, finding plaintiff's complaint "that she was not able to get as much overtime as the other supervisors in her department . . . deficient because it is comprised [sic] only of her own conclusory testimony"); *see also Tulrey*, 803 F. Supp. 2d at 236 (finding failure to show adverse employment action in Title VII case where plaintiff did not "identify any instance where he

45

was denied requested overtime work so that it could be given to others").

The parties appear to agree that Rivers worked some overtime. (*See* Pl. Resp. to NYCHA 56.1 at ¶ 61; Pl. Resp. to Union 56.1 at ¶ 68.). Rivers also concedes that he was offered, but did not accept, overtime on weekends. (ECF No. 99, Joint Deposition Appendix ("Dep. App'x."), Rivers Dep. at 62. ("Q: Have you worked overtime on weekends? A: No. Q: Were you offered the opportunity to work overtime on weekends? A: Yes.").) The parties disagree about when overtime was principally available: Rivers argues that it was generally available in the late evening on weekdays while the Union contends that it was generally available on weekends. (*Compare* Pl. 56.1 at ¶ 54, *with* Union Resp. to Pl. 56.1 at ¶ 54.)

Resolution of the dispute regarding the availability of overtime is unnecessary. Rivers' claim on the overtime issue boils down to an argument that depriving him of overtime in his desired timeframe (while offering him overtime at a time he contends is less desirable) amounts to an adverse employment action. Rivers cites no caselaw to support such a novel argument. Further, Rivers has failed to direct the court to any particular request for overtime that was denied. His broad, conclusory statements that he was treated differently from his similarly situated co-workers with respect to the provision of overtime do not create a genuine issue of material fact about whether the overtime denials

46

constitute adverse employment actions. No rational jury could find that the denial of overtime in the circumstances outlined above "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Zelnik*, 464 F.3d at 225 (internal quotation marks and citation omitted).

*(4) Family and Medical Leave Act*

Rivers' arguments about Family and Medical Leave Act requests fall short for very much the same reason. As with denial of overtime, denial of FMLA leave can constitute an adverse employment action. *See Thompkins v. Potter*, 451 F. Supp. 2d 349, 358 (D. Conn. 2006) (recognizing that a denial of FMLA leave could, for example, "force an employee to work without adequate child care resources"). Rivers' only support for his claimed improper denial of FMLA requests, however, is his statement in his affidavit that he "applied for FMLA leave from NYCHA on multiple occasions [between June or July 2008 and January 2013] to take care of my mother, who was very ill. NYCHA denied each of these leave requests." (ECF No. 102, Declaration of Alexander Coleman, Ex. B, Declaration of Jakwan Rivers at ¶ 63; Pl. 56.1 at ¶ 55.) Rivers does not dispute that NYCHA approved multiple six-month intermittent leave requests under the FMLA between June 2008 and January 2013. (Pl. Resp. to NYCHA 56.1 at ¶¶ 107-08; Niederhoffer Decl., Ex. 60.) Additionally, Rivers provides no evidence supporting his application for (or the denial of) FMLA leave. He

does not provide the names of the individuals to whom he submitted the requests and he provides no dates on which the denials occurred. Without any additional evidence beyond his bare and undetailed testimony, the denial of FMLA leave cannot form the basis of an adverse employment action.

*(5) Training*

Rivers next argues that his requests for additional training or for a transfer to a position for which he was adequately trained fell on deaf ears at NYCHA and the Union. (Pl. 56.1 at ¶¶ 15, 17-18, 30-32.) "Denial of training can constitute an adverse employment action . . . ." *Hill v. Rayboy–Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) (quoting *Nakis v. Potter*, No. 01-CV-10047, 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004)).

Rivers alleges that he was undertrained for his work as a maintenance worker at NYCHA. (Pl. Opp'n at 27.) He alleges that his new duties included electrical repairs, plumbing, carpentry, refrigerator and range/stove repair, and door and window work. (Pl. 56.1 at ¶ 15.) Prior to his assignment, he claims, NYCHA failed to provide him with adequate training. (*Id.*) He claims that his lack of training ultimately led him to seriously injure his eye socket while attempting to clear a sink and tub stoppage at a resident's apartment in July 2010. (*Id.* at ¶¶ 39-45; *see also* NYCHA 56.1 at ¶ 89.)

Rivers concedes, however, that during a two-week period in November and December 2009, shortly after he was transferred to the South Jamaica Houses, he was provided "sporadic and superficial one-on-one training on some of his job functions," but states that his training was "insufficient to prepare Rivers to perform these job functions safely or adequately." (*Id.* at ¶ 17.) He concedes also that he did not perform well at the trainings he attended. (*Id.* at ¶ 18.) Rivers also does not dispute the following facts: his NYCHA application in 1998 reflected training in electrical, plumbing, and carpentry (NYCHA 56.1 at ¶ 58); he was provided with multiple trainings before late 2009 including a safety refresher course, a refrigerator repair course, and window pane maintenance (*id.* at ¶ 59); he was scheduled for but failed to attend trainings for basic electrical repair, basic plumbing, worker safety, and dust control and cleanup (*id.*); after requesting training upon his placement as a maintenance worker, he was immediately scheduled to attend multiple maintenance skills training courses but did not appear for some of the courses. (*id.* at ¶ 69-71).

Even taking as true all of Rivers' allegations and resolving every ambiguity in his favor, no reasonable jury could conclude — based on the evidence he has proffered — that the failure to adequately train at issue here would deter a similarly situated individual of ordinary firmness from exercising his constitutional rights. *See Washington v. Cnty. of Rockland*, 373

F.3d 310, 320 (2d. Cir. 2004); *see also Zelnik*, 464 F.3d at 225.
There is no dispute that Rivers was provided multiple opportunities
to train. There is no dispute that he took advantage of many
training opportunities. There is no dispute that he failed to take
advantage of some training opportunities. The central harm he
claims occurred as a result of the failure to train him was the
eye socket injury he suffered while attempting to clear a sink and
tub stoppage. Rivers acknowledges, however, that he had training
in plumbing, and that he received one-on-one training in clearing
and controlling plumbing stoppages including tub and sink
stoppages. (Pl. Resp. to NYCHA 56.1 at ¶¶ 58, 77, 91.) Perhaps
most significantly for his July 2010 eye injury and its alleged
relationship to the purportedly retaliatory failure to train,
Rivers admits that he was scheduled for, but failed to attend, a
basic plumbing course in April 2009 (*id.* at ¶ 59), approximately
15 months before he suffered the injury.[21] (Pl. 56.1 at ¶¶ 39-41.)
Consequently, even construing all the evidence in Rivers' favor,

---

[21] Rivers also alleges that he suffered a serious back injury in December
2009, one month after formally requesting training, while removing an
overhead cabinet in a tenant's apartment. (Pl. 56.1 at ¶ 38.) He alleges
that he had not been properly trained prior to his December 2009 back
injury to safely perform such carpentry work. (*Id.*) Rivers stated on his
1998 NYCHA job application, however, that he had received training in
carpentry work. (NYCHA 56.1 at ¶ 58.) He admitted that he took part in
training for the maintenance and repair of doors, but also missed part
of that training. (*Id.* at ¶ 71.) For the same reasons outlined above,
the court concludes that the asserted failure to train Rivers adequately
in cabinet repair work does not constitute an adverse employment action.

NYCHA's failure to train Rivers in the circumstances he has described cannot constitute an adverse employment action.

*(6) Workers' Compensation*

Rivers next alleges that NYCHA contested, with a retaliatory purpose, the workers' compensation benefits he sought after the July 2010 eye socket injury. (Pl. 56.1 at ¶¶ 39-45.) Plaintiffs point to no authority indicating that an employer's decision to contest workers' compensation benefits can constitute an adverse employment action for purposes of a retaliation claim. In fact, the New York Workers' Compensation Law provides an "exclusive remed[y]" to employees for retaliation and discrimination for seeking workers' compensation. *Ridgway v. Metro. Museum of Art*, No. 06-CV-5055, 2007 WL 1098737, at *5 (S.D.N.Y. Apr. 10, 2007) (dismissing allegations that employer "mishandled [plaintiff's] workers' compensation claim, retaliated against him, and unlawfully terminated his employment because he sought and obtained workers' compensation" for lack of jurisdiction because of exclusive state-law remedy (citing *Burlew v. Am. Mut. Ins. Co.*, 472 N.E.2d 682, 684 (N.Y. 1984))); *Martinelli v. Swissre Holding (N. Am.) Inc.*, No. 95-CV-10996, 1996 WL 125657, at *3 (S.D.N.Y. Mar. 20, 1996) ("Where an employee has a remedy against his employer in proceedings under the Workers' Compensation Law, that remedy is exclusive." (internal quotation marks and citation omitted)); *Williams v. Brooklyn Union Gas Co.*,

819 F. Supp. 214, 231 (E.D.N.Y. 1993) ("As [N.Y. Workers'
Compensation Law § 120] provides a remedy to employees alleging
retaliatory discharge, that section is exclusive and no cause of
action for such a claim exists in the federal district court.").

Accordingly, Rivers cannot show that opposition to his
workers' compensation claim is actionable.

*(7) Physically Demanding Work*

Rivers also proposes that he was subjected to an adverse
employment action when he was assigned physically demanding
responsibilities shortly after his assignment to the South Jamaica
Houses. Heavier workloads or more physically demanding tasks can
constitute adverse employment actions. *See Paul v. Postgraduate
Ctr. for Mental Health*, 97 F. Supp. 3d 141, 196 (E.D.N.Y. 2015)
("The Second Circuit has recognized that increasing an employee's
workload may be an adverse action for the purposes of a retaliation
claim if the increase is heavily disproportionate to those
similarly situated."); *Chacko v. Connecticut*, No. 07-CV-1120, 2010
WL 1330861, at *14 (D. Conn. Mar. 30, 2010) (finding that "a
heavily burdened workload may constitute adverse employment
action"); *cf. Delgado v. Triborough Bridge & Tunnel Auth.*, 485 F.
Supp. 2d 453, 461 (S.D.N.Y. 2007) (finding that the plaintiff's
allegedly increased workload was not an actionable retaliatory
adverse employment action when she failed to plead facts

52

demonstrating that her workload was disproportionate to that of other employees in her department).

Rivers alleges that Madden — his NYCHA supervisor at the South Jamaica Houses — assigned him "the most physically strenuous responsibilities" shortly after Union official Giocastro's statement to Madden that NYCHA could "do anything they want to Rivers" without expecting Union opposition. (Pl. 56.1 at ¶¶ 26-28.) Rivers cites to one particular example. NYCHA management required him to perform a non-emergency repair during an elevator outage, forcing him to carry heavy equipment up five stories of stairs. (*Id.* at ¶ 28.) The assignment had apparently been pending at that time for over two months. (*Id.*) The court will assume for purposes of this decision that assigning Rivers physically strenuous activities like the non-emergency repair constitutes an adverse employment action. The claim based on the physically strenuous activities fails, as discussed below, for failure to establish the requisite causal nexus between the alleged retaliatory act and Rivers' protected activity.

Based on the record before the court, only the disproportionately physically strenuous work assignments to Rivers qualify as adverse employment actions. Even evaluating Rivers' other alleged adverse employment actions together, they do not constitute a "campaign of harassment which though trivial in detail may [be] substantial in gross, and therefore . . . actionable."

*Zelnik*, 464 F.3d at 227. The court turns next to whether Rivers
has shown the requisite causal nexus between his protected activity
and the physically strenuous assignments.

C.   Causation

As discussed earlier, Rivers' protected activity — his
support for Thompson and his work on behalf of Members for Change
— began at least as early as July 2008. (*See supra* Discussion Part
IV.A.) At the latest, as relevant here, Rivers was engaged in
protected activity through November 2009. It is not disputed that
Rivers had an untarnished disciplinary record during his first
term of employment with NYCHA, from April 1998 to January 2006,
when he became a business agent at the Union. (Pl. 56.1 at ¶¶ 1,
22; NYCHA Resp. to Pl. 56.1 at ¶¶ 1, 22; Union Resp. to Pl. 56.1
at ¶¶ 1, 22.) Following his protected activity, though, Rivers'
career at NYCHA and the Union became increasingly unsettled. Rivers
was relieved of his Union position on January 27, 2009, the day
after his announcement — before a substantial Union audience — of
Members for Change's endorsement of Thompson and opposition to the
Floyd slate. (Pl. 56.1 at ¶¶ 11-12.) Rivers states, though the
Union denies, that Floyd directly told him that he was being fired
because he supported Thompson rather than Bloomberg for mayor.
(*Id.* at ¶ 12; Union Resp. to Pl. 56.1 at ¶ 12.) On his first day

back at NYCHA, Rivers received a counseling memorandum for "time theft."[22] (Pl. 56.1 at ¶ 22.)

Rivers' firing from his Union position and his counseling memorandum from his first day, however, are not actionable adverse employment actions in this case because of the 2009 stipulation. (*See supra* Discussion Part I.A.) Although the court does not blind itself to events preceding the stipulation, only one of Rivers' proposed adverse employment actions survived the court's earlier analysis: his allegedly retaliatory workload at NYCHA's South Jamaica Houses.

As to Rivers' workload, he alleges first that Madden "began assigning Rivers the most physically strenuous responsibilities, such as carrying heavy equipment over great distances, rather than to any other maintenance worker." (Pl. 56.1 at ¶ 28.) Rivers, however, provides no particular example or evidence of Madden's burdensome assignments. He provides no dates on which Madden issued the purportedly strenuous assignments. The

---

[22] The parties dispute the date of the counseling memorandum. Defendants allege it was issued for Rivers' activities on February 19, 2009. (*E.g.*, NYCHA Resp. to Pl. 56.1 at ¶ 22; Niederhoffer Decl., Ex. 27.) Viewing the facts in the light most favorable to Rivers, however, it was issued on his first day back at NYCHA, January 28, 2009. (*See* Dep. App'x., Rivers Dep. at 199 (Rivers: "I don't think [NYCHA's] dates are correct.").) As to the substance of the counseling memorandum, Rivers alleges that he had been waiting for the housing project superintendent to give him an assignment and when the superintendent arrived late, the superintendent issued a counseling memorandum to Rivers because Rivers had failed to obtain an assignment from a different supervisor. (Pl. 56.1 at ¶ 22; Niederhoffer Decl., Ex. 27.)

quoted allegation above is too conclusory to support the requisite causal relationship between Rivers' protected activity and the purportedly physically burdensome assignments.

Rivers does, however, point to the elevator incident — in which he was asked to walk up five flights of stairs with heavy equipment for a non-emergency repair — as evidence of a physically strenuous assignment. (*Id.*) However, Rivers provides no statement about who actually issued the non-emergency repair assignment to him. "It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action." *Morrison v. Johnson*, No. 01-CV-636, 2006 WL 2811802, at *19 (N.D.N.Y. Sept. 28, 2006) (citing *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). The doctrine of *respondeat superior* is inapplicable to § 1983 claims. *See Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973), *overruled on other grounds by Graham v. Connor*, 490 U.S. 386, 393 (1989). In Rivers' letter to Madden, NYCHA Chairman Rhea, and NYCHA supervisor Jasper (informing them about the elevator assignment, and suggesting that Madden did not assign the task himself), Rivers provides no information about the individual who issued the repair assignment. Without that critical information and supporting evidence, the court simply cannot evaluate whether Rivers has shown any causal relationship between the increased workload and his protected activity.

Accordingly, Rivers has failed to make the requisite showing to defeat summary judgment on the issue of whether NYCHA retaliated against him for the exercise of his First Amendment rights. Because NYCHA cannot be held liable for retaliating against Rivers on this record, his conspiracy claims against the Union must also be dismissed. *See Harris v. Buffardi*, No. 08-CV-1322, 2011 WL 3794235, at *11 (N.D.N.Y. Aug. 24, 2011) ("In the absence of an underlying constitutional violation, [plaintiff's] charges of conspiracy under § 1983 . . . cannot be maintained."); *see also Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("[A]lthough the pleading of a conspiracy will enable a plaintiff to bring suit against purely private individuals, the lawsuit will stand only insofar as the plaintiff can prove the *sine qua non* of a § 1983 action: the violation of a federal right.").

## V. Crenshaw

To establish a viable First Amendment retaliation claim, Crenshaw must show that: (1) she engaged in constitutionally protected speech as a private citizen speaking on a matter of public concern; (2) she suffered an adverse employment action; and (3) a causal connection exists between her protected speech and the adverse employment action. *See Ruotolo*, 514 F.3d at 188.

### A. Constitutionally Protected Activity

Crenshaw contends that she began attending meetings for Members for Change in August 2008, but became more active and vocal

around January 2009.[23] (Pl. 56.1 at ¶ 59-60; *see also* Crenshaw Decl. at ¶ 11.) In January 2009, she began canvassing on behalf of Members for Change at NYCHA developments and elsewhere in New York City. (*Id.*) At some time around March or April 2009, Crenshaw states that Union Deputy Director Giocastro and NYCHA supervisor Walton discussed Crenshaw's opposition to Floyd in Crenshaw's presence. (Pl. 56.1 at ¶¶ 73-74.) Crenshaw also alleges that Walton, one of her NYCHA supervisors, witnessed her discussing Members for Change with colleagues in April 2009, and told her to stop the discussion immediately. (Pl. Resp. to NYCHA 56.1 at ¶ 129.) She similarly alleges that in or around June 2010, Alexander heard Crenshaw discussing Members for Change with colleagues and observed her wearing pins associated with Members for change, and that Alexander instructed her to stop the discussion immediately and cease wearing the Members for Change pins. (Pl. 56.1 at ¶ 76.) This June 2010 incident is the last protected activity that Crenshaw has asserted.

For the same reasons discussed *supra* with respect to Rivers, the court concludes that Crenshaw's work on behalf of Members for Change in opposition to the Floyd slate and her related

---

[23] The parties appear to agree that plaintiff's 56.1 statement erroneously refers to January 2014 as the beginning of her public support of Members for Change and Thompson. (*E.g.*, NYCHA Reply at 8 n.6.)

support for Thompson for mayor (Crenshaw Decl. at ¶ 7) constituted protected activity.

B.  Adverse Employment Actions

Crenshaw, like Rivers, proposes a long list of actions taken against her that she claims constitute adverse employment actions. For reasons explained in further detail below in the court's discussion about causation (*see infra* Discussion Part V.C), the court will not consider any adverse actions that occurred more than a year after any of Crenshaw's protected activities. The court will therefore only discuss purportedly adverse employment actions that occurred after the commencement of Crenshaw's protected activity in January 2009 (Pl. 56.1 at ¶ 59) and June 2011 (one year after her latest protected activity in June 2010).

The purportedly adverse employment actions that meet the criteria outlined above are as follows: (1) in February 2009, NYCHA supervisors Alexander and Walton assigned her time-consuming and burdensome tasks not normally performed by other assistant housing managers (Pl. 56.1 at ¶¶ 62[24]-64); (2) in February 2009, Alexander and Walton advised her that some of her subordinates would report directly to Alexander rather than Crenshaw, thus stripping her of supervisory authority (*id.* at ¶ 64); (3) she received numerous

_____

[24] Although paragraph 62 of plaintiffs' 56.1 statement states that Alexander and Walton met with Rivers, this appears to be a typographical error and the court construes this paragraph to refer to Crenshaw.

purportedly baseless counseling memoranda between March 2009 and May 2010 (*id.* at ¶¶ 67-72, 79); (4) the Union refused to defend her after she complained about the changes in her job responsibilities and her mistreatment at work (*id.* at ¶¶ 73-74, 79); (5) in June 2010, Alexander sexually assaulted her (*id.* at ¶¶ 71-72); and (6) in August 2010, NYCHA contested her claim for workers' compensation benefits after she became incapacitated (NYCHA 56.1 at ¶¶ 147-49.)

The court employs the same analysis here as with Rivers. Crenshaw must show that the retaliatory action "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik*, 464 F.3d at 225 (internal quotation marks and citation omitted). Although the court evaluates the claims individually, a "campaign of harassment which though trivial in detail may [be] substantial in gross, and therefore . . . actionable." *Id.* at 227.

*(1) New Responsibilities*

The court first evaluates Crenshaw's allegation that assigning her more time-consuming and burdensome tasks not normally performed by other assistant housing managers constitutes an adverse employment action. As discussed earlier, a heavier workload can constitute an adverse employment action. *See Paul*, 97 F. Supp. 3d at 196 ("The Second Circuit has recognized that increasing an employee's workload may be an adverse action for the

purposes of a retaliation claim if the increase is heavily disproportionate to those similarly situated."). (*See also supra* Discussion Part IV.B(7) (discussing legal standards governing enhanced workloads issue with respect to Rivers' similar claim).)

Crenshaw contends that in February 2009 she was assigned multiple tasks not assigned to other assistant housing managers, including creating and maintain a spreadsheet of rented/re-rented apartments and regularly meeting with tenants regarding rent delinquencies. (Pl. 56.1 at ¶ 62.) Crenshaw claims the new tasks were "extremely time-consuming" and created a "significant burden" that other assistant housing managers did not have to bear. (*Id.*) Crenshaw does not dispute NYCHA's proffered evidence that she and assistant managers at other locations were tasked with recording information on spreadsheets regarding the rental status of apartments. Nor does Crenshaw dispute that Alexander and Walton held weekly meetings with other assistant housing managers of a nearby housing location, the Ingersoll Houses. (Pl. Resp. to NYCHA 56.1 at ¶¶ 115-16.) Yet, Crenshaw asserts that her assignments were disproportionate to the assignments for other assistant housing managers and disputes whether she underperformed at work. (*See* Pl. Resp. to NYCHA 56.1 ¶¶ 115-120, 134; Pl. 56.1 at ¶¶ 62-64.) Even construing the facts in the light most favorable to Crenshaw, however, as the court must, a reasonable jury could not conclude that the increased workload required of Crenshaw and other

assistant housing managers at other locations — even in conjunction with the counseling memoranda that appear to address defendants' allegations that Crenshaw failed to complete certain work on time (*see* NYCHA 56.1 at ¶ 121) — constituted an adverse employment action. Crenshaw does not dispute NYCHA's evidence that she and other assistant housing managers were required to add the spreadsheet data to their job duties. (Pl. Resp. to NYCHA 56.1 at ¶ 116.) She does not establish that she was burdened with extra duties. Accordingly, her new responsibilities were not adverse employment actions imposed in retaliation for protected activity.

*(2) Lost Supervisory Authority*

Crenshaw next argues that Alexander and Walton stripped her of some of her supervisory authority for retaliatory purposes. (Pl. 56.1 at ¶ 64.) Crenshaw claims that, at the same aforementioned February 2009 meeting, Alexander and Walton informed her that her subordinates would report directly to Alexander. (*Id.*) Alexander then followed up with Crenshaw's subordinates, telling them to report directly to him. (*Id.*) Defendants assert that Crenshaw complained to Alexander about her workload, which was the same as that of other assistant managers, but deny that Crenshaw suffered any change in supervisory responsibilities. (NYCHA Resp. to Pl. 56.1 at ¶ 64; NYCHA Mem. at 19.) "[S]ignificantly diminished material responsibilities" can constitute an adverse employment action. *Terry v. Ashcroft*, 336

F.3d 128, 138 (2d Cir. 2003); *see also McCollum v. Reno*, No. 95-CV-1237, 1996 WL 294257, at *2 (D.D.C. May 28, 1996) (finding that employee could show an adverse employment action where "her supervisory responsibilities were reduced," even without a change in title). The court concludes that Crenshaw's loss of supervisory authority could constitute an adverse employment action.

*(3) Baseless Counseling Memoranda*

Crenshaw next argues that she received multiple baseless counseling memoranda between February 2009 and May 2010. (Pl. 56.1 at ¶¶ 67-72, 79.) Significantly, in the 14 years at NYCHA preceding Crenshaw's political activity, she received no negative evaluations and just a single counseling memorandum. (Pl. 56.1 at ¶ 66.) Between February 2009 and May 2010, Crenshaw was issued at least nine counseling memoranda. For example, in March 2009, she missed work during a snowstorm that she alleges "crippled public transportation and prevented her commute to work." (*Id.* at ¶ 67.) At least two others were issued for Crenshaw's yelling or insubordination that Crenshaw claims never occurred. (*Id.* at ¶¶ 68, 70.) NYCHA concedes that between March 2009 and May 2010 Crenshaw received three instructional memoranda and nine written counseling memoranda[25] for "poor performance, misconduct, and

---

[25] Instructional memoranda provide formal written instructions to an employee that may address conduct or job performance, but instructional memoranda do not constitute disciplinary actions (or go into an employee's personnel file). (Niederhoffer Decl., Ex. 55.) Counseling

insubordination," but asserts that each one was justified. (NYCHA Resp. to Pl. 56.1 at ¶ 69.)

The court recognizes that there is some tension within the Second Circuit regarding whether counseling memoranda can constitute adverse employment actions for purposes of a retaliation claim.[26] *Compare, e.g.*, *Eustache v. Home Depot U.S.A., Inc.*, No. 13-CV-42, 2014 WL 4374588, at *33 (E.D.N.Y. Sept. 2, 2014) ("Even under the more lenient standard applied in retaliation cases, courts have found that counseling memoranda do not qualify as adverse employment actions.") *aff'd*, 621 F. App'x 86 (2d Cir. 2015) and *McPherson v. City of New York*, No. 09-CV-4682, 2011 WL 4431163, at *7 (S.D.N.Y. Sept. 23, 2011) ("From an objective standpoint, these critiques - both in person and via memoranda - are all instances of ordinary workplace supervision, oversight, and management."), *with Dingle v. City of New York*, No. 10-CV-4, 2011 WL 2682110, at *6 (S.D.N.Y. July 7, 2011) ("In the Second Circuit, a counseling memorandum, as a formal, written reprimand,

_____

memoranda, however, address "misconduct or incompetent performance" and usually become part of an employee's personnel record. (*Id.*)

[26] Title VII discrimination cases treat counseling memoranda differently. *See Watson v. Geithner*, No. 11-CV-9527, 2013 WL 4028152, at *10 (S.D.N.Y. Aug. 8, 2013) ("The cases in this Circuit uniformly hold that the issuance of such memoranda, unaccompanied by demotion, diminution of responsibilities or the like, does not constitute an adverse employment action for purposes of a discrimination claim." (collecting cases)) *report and recommendation adopted*, 2013 WL 5441748 (S.D.N.Y. Sept. 27, 2013).

sufficiently deters the exercise of constitutional rights to constitute an adverse employment action.").

Even if counseling memoranda unaccompanied by any additional actions might not constitute an adverse employment action, Crenshaw has proffered evidence of nine counseling memoranda that she claims were completely baseless. She contends that at least nine counseling memoranda — including the ones described above — were issued to her between March 2009 and May 2010. In the 14 years preceding the nine counseling memoranda at issue, Crenshaw had received only a single one. A rational jury could find that the allegedly retaliatory stream of counseling memoranda at issue here would deter a similarly situated individual of ordinary firmness from exercising her constitutional rights. *See Zelnik*, 464 F.3d at 225.

*(4) Union Failure to Defend*

Crenshaw's argument about the Union's failure to defend her after she complained about the changes in her job responsibilities and her mistreatment at work fails. The Union's refusal to assist could only *amplify* the consequences of an adverse employment action. The refusal to assist Rivers in a dispute with NYCHA could not, standing alone, be an adverse employment action.

*(5) Sexual Assault*

Crenshaw's next purported adverse employment action is Alexander's alleged sexual assault. Crenshaw argues that, in April

2010, while she was working in a file room, "Alexander pressed up behind [her] and rubbed his erect penis on her buttocks." (Pl. 56.1 at ¶ 71.) Crenshaw immediately filed a complaint with NYCHA's Department of Equal Opportunity, but she believes NYCHA took no action. (*Id.*) Alexander subsequently issued her a counseling memorandum "for being AWOL during the time she went to the Department of Equal Opportunity." (*Id.* at ¶ 72.) NYCHA and Alexander denied the assertions of sexual assault and asserted that an internal NYCHA EEO investigation of Alexander was dismissed, and that the asserted facts are "immaterial." (NYCHA Resp. to Pl. 56.1 at ¶¶ 71-72.) There is no evidence that Crenshaw pursued the sexual assault claim further.

Physical assaults qualify as adverse employment actions for purposes of a First Amendment retaliation claim. *See e.g.*, *Manon*, 2015 WL 5507759, at *8 ("The physical assault that [plaintiff] describes — during which [defendant] allegedly ran full-throttle into her, causing significant injury — would be sufficient to dissuade a reasonable person from exercising her First Amendment rights."). Alexander's alleged sexual assault of Crenshaw, which is disputed, nonetheless could qualify as an adverse employment action in this case.

*(6) Workers' Compensation*

Crenshaw's final proposed adverse employment action is NYCHA's allegedly retaliatory decision to contest her application

for workers' compensation benefits in August 2010. (NYCHA 56.1 at ¶¶ 147-49.) For the same reasons discussed above with respect to Rivers' substantially similar allegation (*see supra* Discussion Part IV.B(6)), retaliatory opposition to workers' compensation benefits cannot constitute an adverse employment action.

C. <u>Causation</u>

The court turns next to defendants' arguments that Crenshaw has failed to adequately establish evidence of causality between her protected activity and the adverse employment actions. The court will address whether enough evidence of a causal link has been established by Crenshaw to defeat summary judgment.

As discussed earlier, causation may be shown: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). Although a plaintiff must produce "some tangible proof to demonstrate that [her] version of what occurred was not imaginary," summary judgment is precluded where questions about the employer's motive predominate. *Morris*, 196 F.3d at 111 (citation omitted).

Viewing the facts in the light most favorable to Crenshaw, the court concludes that the earliest any of the defendants could have known of her opposition to Floyd and support for Thompson was in January 2009. (Pl. 56.1 at ¶ 75.)

Over the course of Crenshaw's 14 years at NYCHA, before her support for Members for Change and Thompson for mayor, "she did not receive any negative evaluations and just one counseling memorandum, which was issued in the first year or two of Crenshaw's employment (i.e., in or about 1995 or 1996)." (Pl. 56.1 at ¶ 66; Crenshaw Decl. at ¶¶ 19-20.) Defendants do not seriously dispute Crenshaw's virtually unblemished disciplinary record prior to March 2009. (*See* NYCHA Resp. to Pl. 56.1 at ¶ 66; Union Resp. to Pl. 56.1 at ¶ 66.)

As discussed earlier, Crenshaw alleges that a series of retaliatory adverse employment actions followed shortly after her protected activity began. The court discusses only the actions found above to constitute adverse employment actions. First, Crenshaw states that Alexander and Walton stripped her of her supervisory authority by informing her that her subordinates would report directly to Alexander instead of to Crenshaw. (*Id.* at ¶ 64.) Second, she claims that she received approximately nine baseless counseling memoranda between March 2009 and May 2010. (*Id.* at ¶¶ 68-69.) Third, she claims that NYCHA supervisor Alexander

sexually assaulted her and that NYCHA failed to adequately follow up on her report of the sexual assault.

Additionally, Crenshaw contends in or around March 2009, she told Walton that the unwarranted counseling memoranda, increased workload, and reduced supervisory authority were unfair. (Pl. 56.1 at ¶ 73.) Walton responded that he was not concerned with Crenshaw complaining to the Union because he and defendant Ferguson — the director of the Union's housing division — had known each other for 18 years. (*Id.*) Soon after that conversation, plaintiffs assert that Rivers complained to the Union, and Giocastro personally attended a meeting with Crenshaw and Walton. (*Id.* at ¶ 74.) Giocastro began to argue to Walton that one of the counseling memoranda Walton had issued to Crenshaw was "unwarranted and outrageous," after which Walton stated: "Don't you know who this is, she is the one who is going up against you and Floyd."[27] (*Id.*) Crenshaw alleges that Giocastro thereafter immediately ceased defending her with respect to that counseling memorandum. (*Id.*)

Crenshaw's opposing evidence is sufficient to create a genuine issue of material fact regarding causation with regard to Walton and Alexander. First, Crenshaw's allegations place many of

---

[27] The purported statement made by Walton appears in Crenshaw's affidavit filed in support of plaintiffs' opposition to the motion for summary judgment, and was not referenced either in the amended complaint or Crenshaw's deposition. (*See* Crenshaw Decl. at ¶ 29.)

the adverse employment actions in close proximity to her protected activity. In the same month (April 2009) that Walton allegedly heard Crenshaw discussing Members for Change with colleagues and told her to stop discussing the group, he issued her a counseling memorandum for insubordination that she claims was baseless. (Pl. 56.1 at ¶¶ 68, 75; NYCHA 56.1 at ¶ 121.) Three more counseling memoranda followed in May, each issued by Alexander. (Pl. 56.1 at ¶ 69; Niederhoffer Decl., Ex. 64.) There is a dispute as to whether Alexander and Walton purportedly reduced her supervisory authority one month after she became more vocal on behalf of Members for Change. (Pl. 56.1 at ¶¶ 62-64.) The temporal proximity here could lead a reasonable jury to find that her support for Thompson and work on behalf of Members for Change was the but-for cause of (or a substantial motivating factor behind) the adverse employment actions.[28] *See Bagley v. J.P. Morgan Chase & Co.*, No. 10-CV-1592, 2012 WL 2866266, at *10 (S.D.N.Y. July 12, 2012) (holding that

---

[28] Alexander's purported sexual assault of Crenshaw in April 2010 presents a closer call as to causation. The complication arises because the assault occurred in a window during which Crenshaw does not allege any protected activity. The sexual assault occurred long after Rivers' April 2009 discussion about Members with Change in front of Walton (Pl. 56.1 at ¶ 75), and two months before Alexander overheard her discussing Members with Change in June 2010. (*Id.* at ¶ 76.) There is no direct evidence of a retaliatory motive in the assault allegation, so causation must be premised on temporal proximity. Because the April 2010 assault allegedly occurred approximately one year after Crenshaw's most recent protected activity in April 2010, the court concludes that no reasonable jury could find that Crenshaw's protected activity in April 2009 was either the but-for cause of, or a substantial motivating factor in, the April 2010 assault.

less than three months was sufficient temporal proximity to support a prima facie case of retaliation under the ADEA); *Reuland v. Hynes*, No. 01-CV-5661, 2004 WL 1354467, at *11 (S.D.N.Y. June 17, 2004) (finding a four-and-one-half-month gap sufficient to sustain an inference of causation for First Amendment retaliation claim). Second, the causal nexus between her protected activity and the adverse employment actions is strongly reinforced by Crenshaw's nearly spotless disciplinary record preceding her protected activity.

By contrast, Crenshaw has failed to create a genuine issue of material of fact as to Rhea's participation. As discussed with respect to Rivers (*see supra* Discussion Part IV.C), "[i]t is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action." *Morrison*, 2006 WL 2811802, at *19. Crenshaw states that between 2009 and 2010 she "regularly emailed NYCHA managers, including Chairman Rhea[,] to complain" about her circumstances. (Crenshaw Decl. at ¶ 27.) This bare statement is the only evidence offered even remotely suggesting Rhea's involvement in the alleged retaliation here. None of the purported emails Crenshaw referenced in her affidavit appear in the record.[29] Further, there is no

---

[29] The absence of emails to and from Crenshaw in the record is particularly notable given that discovery uncovered a substantial number of Rivers' emails with NYCHA and Union officials.

indication that Rhea had any knowledge of Crenshaw's political activities or the actions purportedly taken by Alexander and Walton. In any case, the "fact that Plaintiff may have written a letter or emails does not automatically render the supervisory official responsible for any constitutional violation." *Morrison*, 2006 WL 2811802, at *20; *see also Thomas v. Coombe*, No. 95-CV-10342, 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998) ("[T]he fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement.").

Crenshaw faces a similar problem with regard to Floyd and Ferguson, the remaining Union defendants. With respect to Floyd, plaintiffs' briefing never suggests that any contact was made between Floyd and Crenshaw. Crenshaw never even states that Floyd knew who she was. In the only section of plaintiffs' briefing directly challenging defendants' arguments regarding the personal involvement of the individual defendants, not a single fact is mentioned to support Floyd's involvement in the alleged retaliation against Crenshaw. (*See* Pl. Opp'n at 40.) Additionally, it is undisputed that "Floyd has no knowledge of any discipline imposed by NYCHA on Crenshaw." (Union 56.1 at ¶ 88; Pl. Resp. to Union 56.1 at ¶ 88.) Floyd therefore cannot be held liable for any retaliation directed at Crenshaw.

Union official Ferguson's involvement presents a more difficult issue. In plaintiffs' amended complaint, they allege

that the NYCHA defendants repetitively disciplined Crenshaw "at the behest of" Ferguson. (Am. Compl. at ¶ 90.) In her affidavit, however, Crenshaw provides only a single allegation regarding Ferguson's involvement in the alleged retaliation. Crenshaw claims that when she complained to Walton in March or April 2009 about the increased workload and mistreatment she was experiencing at NYCHA, Walton said he was not concerned about her complaining to the Union because of his friendship with Ferguson, whom he had known for nearly two decades. (Crenshaw Decl. at ¶ 28.) Plaintiffs' 56.1 statement does not allege any further involvement by Ferguson.[30] Even viewing the friendship between Walton and Ferguson in the light most favorable to Crenshaw, it is insufficient to create a genuine issue of material fact regarding Ferguson's involvement in the retaliatory acts at issue in this case. *See Kohlhausen v. SUNY Rockland Cmty. Coll.*, No. 10-CV-3168, 2011 WL 2749560, at *8 (S.D.N.Y. July 13, 2011) (holding that "mere fact" of a union defendant's friendship with the alleged harasser could not support a conspiracy). Based on the evidence presented by

---

[30] Plaintiffs' briefing states that Crenshaw "made multiple complaints to the Union, through Ferguson, regarding [her] treatment, and each time the complaints were utterly ignored." (Pl. Opp'n at 40.) Crenshaw does not allege, however, that Ferguson participated in any way in addressing any of her Union grievances. Her complaints about the Union's failure to represent her are directed principally at Union official Giocastro (*see* Crenshaw Decl. at ¶¶ 29-30, 38), but Crenshaw never connects any allegedly retaliatory conduct by Giocastro to Ferguson in her affidavit, her 56.1 statement, or her briefing.

Crenshaw, no rational jury could find that Ferguson was personally involved in the alleged retaliation directed at Crenshaw.

## CONCLUSION

Defendants' motions for summary judgment are GRANTED in part and DENIED in part. The court concludes that all of the Union defendants must be dismissed from this action. Rivers' claims against the NYCHA defendants are also dismissed. Crenshaw's claims survive, but only as against Walton and Alexander in their individual capacities. The only remaining purportedly adverse employment actions are Crenshaw's alleged loss of supervisory authority and the allegedly baseless counseling memoranda she received.

**SO ORDERED.**

Dated:    March 31, 2016
          Brooklyn, New York

                              _____/s/_____
                              Kiyo A. Matsumoto
                              United States District Judge